UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re:

   William C. O'Keefe,          Case No. 19-30173
                      Chapter 7

          Debtor.

Itria Ventures LLC           Adv. Pro. No. 19-50010

          Plaintiff,

   v.

William C. O'Keefe

          Defendant.

**FILED**

**SEP 1 1 2020**

OFFICE OF THE BANKRUPTCY CLERK
SYRACUSE, NY

Appearances:

Teresa M. Bennett, Esq. & Anneliese Rae Aliasso     *for Plaintiff*
Barclay Damon LLP
Barclay Damon Tower
125 East Jefferson Street
Syracuse, NY 13202

Theodore Lyons Araujo, Esq.         *for Defendant*
Bankruptcy Law Center
PO Box 698
Syracuse, NY 13201

## Memorandum-Decision and Order

   Itria Ventures LLC ("Itria" or "Plaintiff") seeks to have its debt of $178,720.68, that was

reduced to judgment and guaranteed by Debtor William C. O'Keefe, declared nondischargeable

pursuant to 11 U.S.C. § 523 (a)(4) and (a)(6). Debtor answered the complaint by general denial.

The parties stipulated to certain underlying facts and the court conducted a trial at which Debtor

was the only witness to testify.[1]  At the conclusion of Itria's case in chief, Debtor moved to dismiss

the complaint, upon which this court reserved decision.  This memorandum-decision incorporates

the court's findings of fact and conclusions of law as permitted by Federal Rule of Bankruptcy

Procedure ("FRBP") 7052.

### Jurisdiction

The court has jurisdiction to hear this core proceeding pursuant to 28 U.S.C. § 1334(b) and

§157(a), (b)(1) and (b)(2)(I).  Pursuant to FRBP 7008, the parties consent to entry of a final order

and judgment by this court.

### Factual and Procedural History

The facts are largely undisputed.  Debtor William C. O'Keefe has been working in the

swimming pool business since at least 1988, when he went to work for Syracuse Pool Center, Inc.

(the "Company").  The Company had a retail location where it sold an extensive array of pool-

related accessories including patio furniture, umbrellas, solar and leaf covers as well as articles

relating to the maintenance and service of pools, hot tubs and spas.  Debtor testified that he worked

the retail end of the business.  The Company also did construction and installation of pools, hot

tubs and spas.  Over the course of its operations, Debtor testified that the Company had

"thousands" of customers (Tr. 53).  The Company had multiple employees, including a

---

[1] In addition to the Joint Stipulation of Facts (Doc. 17) ("Stip.") and transcript of the February 21, 2020 trial (Doc. 31) ("Tr. _"), the record is comprised of the following exhibits which were admitted into evidence at trial: Future Receivables Sale Agreement dated March 20, 2018 ("Ex. 1"), Judgment entered March 28, 2019 against Syracuse Pool Center, Inc. ("Ex. 2"), work completed by Syracuse Pool Pros after February 2019 ("Ex. 5"), Syracuse Pool Pros' invoice list from April 15 2019 to September 15, 2019 ("Ex. 8"), KeyBank receipt dated February 19, 20 17"19 ("Ex. 9"), list of goods sold to Tarson Pools ("Ex. 10"), title to a 1996 International dump truck ("Ex. 11"), title to a 2006 Isuzu NPR van ("Ex. 12"), title to a 2017 Curra trailer ("Ex. 13"), registration for a 2004 Spa dolly trailer ("Ex. 14"), April 10, 2019 Onondaga County Business Certificate for William O'Keefe d/b/a Syracuse Pool Pros ("Ex. 15"), Aquatic Parts Company invoice dated June 25, 2019 ("Ex. 16"), KJ Electric Invoice dated September 10, 2019 ("Ex.17"), Northern Supply invoice dated September 10, 2019 ("Ex.18"), Employee Payroll record June 2018 through December 2018 for William C. O'Keefe ("Ex. 20"), Debtor's chapter 7 bankruptcy petition and schedules ("Ex. 22") and excerpts from September 16, 2019 deposition testimony of William C. O'Keefe ("Ex. A").

bookkeeper, and used an outside vendor for its payroll. In 2001, Debtor purchased the Company and became its principal and sole shareholder.

*Itria's extension of financing to the Company*

In March 2018, Debtor sought short-term bridge financing from Itria to cover the Company's business operations and entered into a "Future Receivables Sale Agreement" ("Agreement"). Debtor signed the Agreement on behalf of the Company and as a personal guarantor. Debtor testified that the Company had previously obtained between five and eight cash advance loans in the past. The financing with Itria was structured as a cash purchase by Itria (referred to as "Purchaser" under the Agreement) of $254,600.00 of the future receivables of the Company (referred to as "Merchant"). "Future Receivables" was broadly defined to include not only accounts receivable of the Company but also accounts of subsidiaries and affiliated companies and, upon a material breach, the accounts of any new company controlled by Merchant or Guarantor.[2] Under the Agreement, Itria was granted a security interest in not only all accounts receivable of the Company but also the receivables of any other person or entity whose accounts are included in Future Receivables. Additionally, the security interest covered all Company property used in its business, including equipment and inventory and, upon a material breach, a

---

[2] **"Future Receivables"** means any and all funds that Merchant receives from its customers using credit cards, charge cards, debit cards, prepaid cards, benefit cards, or similar cards to purchase Merchant's products and/or services...; (ii) funds that Merchant receives from the its [sic] customers of cash, checks, money orders or other electronic transfers or other forms of payment to purchase Merchant's products and/or services; (iii)accounts, future accounts, contract rights, choses in action and any other rights to payment ... 'Future Receivables' also includes the future Receivables of Merchant's subsidiaries and affiliated companies and, upon a Material Breach of any (x) new or existing company owned or controlled by Merchant or Guarantor (collectively, an 'Other Business'), (y) any new or existing company, whether owned or controlled by Merchant or Guarantor  or any third party, to which all or a material portion of the business or assets of Merchant are sold or otherwise transferred (collectively, a "Successor Company') or (z) any affiliate of any of the foregoing, in each case without the express prior written consent of Purchaser." Ex. 1, Section (2)(d) at p.3.

3

security interest in the property of any successor company or guarantor.[3] The Agreement provided

that it would be governed and enforced exclusively in accordance with Delaware law. (Ex. 1,

Section (15)(a) at pp. 10-11).

The Company received $190,000.00, net of fees.[4] There is no evidence that, after closing,

Itria perfected its security interest in any of the collateral. The payment terms of the Agreement

provided that Itria would automatically deduct from the Company's operating account each

business day $505.16, calculated as a percentage of the Company's receivables. Instead of paying

Itria $254,600.00—the original, face amount of the "purchases"—the Company could fully satisfy

the debt by paying the reduced amount of $228,000.00, if paid within six months by September

30, 2018. The Company intended to exercise this early payment option by obtaining a loan from

the Small Business Administration. However, that never happened. Instead, the Company

continued to have daily payments on the debt debited from its operating account in the ensuing

months.

---

[3] "(a) *Security Interest*... In order to evidence the sale of the Amount Sold of Future Receivables to Purchaser, Merchant hereby grants to Purchaser, in the name of Purchaser or its duly authorized representative, a first priority, continuing security interest, or, if a prior third-party lien has been express consented to by Purchaser in this Agreement, a senior and continuing security interest, in and to: (i) the Amount Sold of Future Receivables of Merchant (and any subsidiary or other person or entity whose accounts are included in Future Receivables) purchased pursuant to this Agreement; (ii) all property used in Merchant's business (including the business of any subsidiary or other person or entity whose accounts are included in Future Receivables) that relates to the Amount Sold of Future Receivables described in clause (i) above, including all accounts...deposit accounts... equipment and inventory as those are defined in Article 9 of the Delaware UCC, as amended, whether now or hereafter owned or acquired by Merchant (and/or any subsidiary or other person or entity whose accounts are included in Future Receivables) and wherever located; (iii) all proceeds of such property described in clause (i) and/or (ii), as that term is defined in Article 9 of the UCC; (iv) upon a Material Breach, the assets and collateral of any Other Business, Successor Company or Guarantor; and (v) any additional collateral as may be mutually agreed between Merchant and Purchaser in writing (collectively, the 'Collateral')...." Ex. 1, Section (9)(a) at p. 8.

[4] The parties stipulated that Itria "made a cash advance" to the Company "in the amount of $254,600.00." Stip. at ¶1. To the extent that this court's finding contradicts the parties' stipulation, the court overrides the stipulated language based upon this court's interpretation of the Future Receivables Sale Agreement (Ex. 1) and the record. See *In re Roland*, 294 B.R. 244, 250 (Bankr. S.D.N.Y. 2003) ("[T]he court is not bound by a stipulation of facts if...the evidence contrary to the stipulation is substantial.").

*Wind-down of Company's operations*

According to Debtor, the Company decided to cease business operations at the end of 2018 because the Company "wasn't making any money." (Tr. 26). At the end of August, Debtor had started to terminate some of the more well-paid employees and about 15 employees remained at the Company in September. (Tr. 77). By December, no work was being done and all employees had been let go. (Tr. 26, 77). By February 2019, the Company was subject to eviction. (Tr. 42). Debtor characterized this period as a "mad scramble" during which he reached out to other pool companies to attempt to sell the remaining inventory. (Tr. 42). He described the inventory as a miscellaneous assortment of items, some of which had been for sale for as long as the Company was in business. *Id.*

Debtor proceeded to sell some of the Company's remaining inventory to Tarson Pools, a local competitor, for a total purchase price of $9,589.44. (Ex. 10). Debtor testified that this was well below the wholesale cost of the goods but that Tarson Pools had made the purchase offer, which Debtor accepted. Debtor stated that his only alternative would have been to throw out the goods. (Tr. 43-44). Debtor did not collect and retain this payment on behalf of the Company. Instead, he directed that Tarson Pools' payment go directly to Let's Play Syracuse, a company owned jointly by the Debtor and his brother-in-law. Debtor testified that the Company owed Let's Play Syracuse for some invoices it had paid on the Company's behalf. This was not memorialized in any formal loan document nor was there any evidence apart from Debtor's oral statement. (Tr. 44-45). Debtor testified that the money never came into the Company's possession, because the Company's bank account was closed. (Tr. 45).

Inventory that was not sold to Tarson Pools was destined for the trash heap. Debtor testified that the Company made "dump runs" to throw out the remaining inventory. (Tr. 45). In

the midst of cleaning out the storage area, a passerby inquired about the Company's solar covers. (Tr. 45). Debtor responded that he had to get rid of them and allowed the person to take approximately 50 solar covers. (Tr. 45-46, Stip. at ¶ 16). Debtor received no payment for the solar covers, which he testified would retail for approximately $100.00 each. *Id.* Debtor professed that he was unaware that Itria had a security interest in anything other than the Company's future receivables because Itria had focused on the Company's bank statements and receivables in extending financing. (Tr. 37).

Debtor testified that operations "officially" ceased in February 2019. (Tr. 26). On February 19, Debtor closed the Company's operating account, from which Itria was making daily withdrawals pursuant to the Agreement. (Ex. 9). At the time, the account contained $7,790.63, from which Debtor withdrew $7,336.15. (Ex. 9). Debtor admits that he knew the account was used to remit payments to Itria, and that closing it would result in no further remittals. (Tr. 39). Debtor testified that he had not taken a paycheck from the Company for at least three months and, when he closed the account, he considered the $7,336.15 to be his wages and deposited that sum in his personal bank account. The Company had used a third-party vendor to issue employee paychecks and required payroll deductions were taken for payment of FICA and social security taxes. (Tr. 41). These deductions were not made from the lump-sum withdrawal taken by Debtor. *Id.*

When the operating account closed, the Company defaulted in making payments under the Agreement, leaving a balance owing of $141,114.00 plus costs, fees and interest. (Stip. at ¶ 3). Itria obtained a state court judgment against the Company in the amount of $178,720.68 on March 28, 2019. (Ex. 2). Debtor was not joined in the state court action as he had already invoked bankruptcy protection. (Stip. at ¶ 4).

6

*Debtor's Bankruptcy Filing*

Debtor filed bankruptcy on February 20, 2019, the day after he withdrew the funds from the Company's operating account. Debtor's schedule E/F lists Itria as an unsecured creditor, a status which Itria acknowledges in its filed proof of claim.[5] Fully disclosed in Debtor's schedule A/B and attributed as assets owned by the Company in Debtor's possession are the following items of personal property: 1996 International dump truck (the "dump truck"), 2006 Isuzu NPR (the "box truck"), 2017 Curra Trailer (the "trailer"), Bobcat excavator (the "Bobcat"), 2004 Spa dolly (the "spa dolly"); hand tools, including a hammer, drill, shovels, rakes and a wheelbarrow; "6 desks approximately ten years plus old; 4 PC computers approximately 8 years old on average; various chairs (8); printers, fax machines, etc.", listed as having a total value of $500.00; and "thousands of items of inventory for pool and filter parts, spa parts, outdoor furniture; spa covers, pool covers. Auction value is unknown." (Ex. 22). The schedules were dated as signed and certified by Debtor as of February 20, 2020, the day of filing. Particularly of interest is Debtor's response in schedule A/B to Question 38, which asked about any accounts receivable. Debtor responded: "Yes. Syracuse Pool Center Inc. for work yet to be completed. This is from sales that were made but represents work in progress. If the work is not done this remainder cannot be collected." The Debtor ascribes a value to the asset of "$6,756.00".

Debtor's schedule A/B also lists a personal KeyBank checking account balance of $8,734.26, characterized as "wages earned in the prior 60 days including funds that were transferred from Syracuse Pools in the days before the filing of the bankruptcy." *Id.* Debtor sought to exempt $7,860.83 of the checking account balance, as shown in his list of exempt property on schedule C, to which Itria timely objected. *See* Main Case at Doc. 14.

---

[5] *See* Claim 10-1 in Case No. 19-30173 ( "Main Case"), of which the court takes judicial notice.

7

*Subsequent work performed by Debtor d/b/a Syracuse Pool Pros*

When Debtor closed the Company, he began operating as a sole proprietor of an outdoor pool service company under the name Syracuse Pool Pros ("Pool Pros"). Doing business as Pool Pros, Debtor performs pool repair and maintenance for customers. He filed a business certificate to operate as a d/b/a/ with the Onondaga County Clerk's Office on April 10, 2019.

Except for the fact that Pool Pros does not conduct a retail outlet and has no employees, Pool Pros conducts the same kind of business as the Company did but on a much smaller scale. (Stip. at ¶ 9). Debtor retained the same email account and mobile telephone number that he had used when working for the Company. (Stip. at ¶¶ 10, 11). Debtor testified that the phone number used by both the Company and now Pool Pros is his personal cell phone number and the email has functioned as Debtor's personal email since 1996. (Tr. 48-49, 98). Debtor renewed the same postal box number that the Company had previously used. (Stip. at ¶ 12). Debtor believed there was no reason to open a different P.O. Box for Pool Pros and he did not wish to use his home address. (Tr. 78-79). The Company had a website, "syracusepool.com" which remained active at the time of trial. Debtor testified that if inquiries for services came through the website, Debtor would receive an email. Debtor testified that his responses to these inquiries would vary from notifying people that the Company was out of business, directing them to other businesses that could help them with what they needed or, if it was something he could perform, informing them that he could help. (Tr. 47-48). Prior customers of the Company have reached out using the domain name to contact William C. O'Keefe d/b/a Syracuse Pool Pros. (Stip. at ¶ 12). Pool Pros has serviced approximately 200 to 250 customers that were prior customers of the Company. (Stip. at ¶ 15).

When the Company ceased operations, it had eight outstanding contracts for work that it was performing for customers. (Ex. 5). Initial contract deposits had been paid to the Company and the Company had performed some of the work in fall 2018. (Tr. 55-58). As the work progressed, customers had made additional payments to the Company. (Tr. 57-58). Debtor completed the Company's jobs under contract and collected any remaining balances due. (Tr. 55-58). Debtor personally collected and retained a total of $12,086.00. (Tr. 55-58). Debtor testified that "it was a moral thing for me just to finish jobs that were started." (Tr. 58). Debtor completed the jobs at a loss. (Stip. at ¶ 14).

From April 15, 2019 to September 15, 2019, Pool Pros performed numerous jobs, some of which was done for former customers of the Company. (Tr. 60, Ex. 8). Debtor used the Company's dump truck, spa dolly, box truck and Bobcat on some of these jobs. (Stip. at ¶ 13). Debtor testified that if he had to rent a dump truck for the work performed, it would have cost him $75.00 an hour. Three jobs required use of the dump truck for a total of sixteen (16) hours (Tr. 60), equating to a rental value of $1,200.00. No rental value was ascribed for use of the spa dolly, box truck or the Bobcat.

### Discussion

To prevail on a claim under Section 523(a), a plaintiff must prove each element by a "preponderance of the evidence." *In re Scheller*, 265 B.R. 39, 51 (Bankr. S.D.N.Y. 2001) (citing *Grogan v. Garner,* 498 U.S. 279, 285 (1991)). Section 523(a) exceptions to discharge are strictly construed in favor of debtors in keeping with the fresh start policy underlying the Bankruptcy Code. See, e.g., *Zohlman v. Zoldan,* 226 B.R. 767, 771 (S.D.N.Y.1998) (internal citations omitted);

*see also In re Wong*, 291 B.R. 266, 276 (Bankr. S.D.N.Y. 2003) ("Discharge provisions must be strictly construed against the creditor and liberally construed in favor of the debtor.").[6]

*Itria's Cause of Action under 11 U.S.C. § 523(a)(4)*

Section 523(a)(4) excepts from discharge a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). Itria seeks to except from discharge its entire claim of $178,720.68 on the alleged basis that Debtor committed fraud or defalcation while acting in a fiduciary capacity. In order to be successful, Itria must first establish that Debtor owed Itria a fiduciary duty as a threshold matter, and that any fraud or defalcation occurred while acting in a fiduciary capacity. See *id.* (emphasis added). Specifically, Itria must prove: (i) Debtor owed Plaintiff a fiduciary duty by virtue of a technical or express trust (ii) the trust relationship—and, therefore, the fiduciary duty—pre-existed the debt's creation and (iii) the debt was generated within the scope of the fiduciary relationship. *In re Guthier*, No. 08-33020, 2010 WL 1443989, at *5 (Bankr. N.D.N.Y. Apr. 9, 2010) (citing *In re Hyman,* 320 B.R. 493, 509 (Bankr. S.D.N.Y. 2005)); *In re Scheller*, 265 B.R. 39, 52 (Bankr. S.D.N.Y. 2001).

Courts narrowly construe the term "fiduciary" for purposes of Section 523(a)(4), "so that it does not reach ordinary debtor-creditor transactions in which the debtor merely violated the terms of his commercial agreement with the creditor." *In re Castagnola*, No. 14-75123-LAS, 2017 WL 1337176, at *4 (Bankr. E.D.N.Y. Apr. 11, 2017) (citing *Zohlman v. Zoldan*, 226 B.R. 767, 772 (S.D.N.Y. 1998)). "'The broad, general definition of fiduciary, involving confidence, trust and good faith, is not applicable in dischargeability proceedings under § 523(a)(4)'; rather, for

---

[6] Itria's complaint includes two causes of action under sections 523(a)(4) and (a)6). The court shall limit its consideration and weigh the evidence as to these two counts and not strain to address other theories of recovery that were never appropriately framed in pleadings before this court. See *In re Malakhov*, 2011 WL 65603, at *1 n.1 (Bankr. S.D.N.Y. Jan. 7, 2011) (declining to consider causes of action that were not raised in the complaint).

purposes of § 523(a)(4), who is a fiduciary 'is a matter of federal law.'" *Id.* (internal citations omitted).

Under federal law, the term "fiduciary" is narrowly defined and applies *only* to technical or express trusts. *In re Danzi*, No. 09-77669-DTE, 2010 WL 3811843, at *3 (Bankr. E.D.N.Y. Sept. 27, 2010). While federal law determines whether or not a fiduciary relationship exists in the context of bankruptcy proceedings, state law determines whether an express, technical or statutorily imposed trust exists. *In re Castagnola*, 2017 WL 1337176 at *4 (internal citations omitted). "An express trust is created by a formal written agreement, while a technical trust may be created by state statute or common law doctrine that imposes a trust-like obligation on the debtor." *In re Danzi*, No. 09-77669-DTE, 2010 WL 3811843, at *3 (Bankr. E.D.N.Y. Sept. 27, 2010) (citing *In re Hayes*, 183 F.3d 162, 170 (2d Cir. 1999)).

Plaintiff does not argue that an express trust existed. There was no formal agreement establishing an express trust and the court concludes that there was none. The extent of the relationship between Plaintiff and Debtor was that of an arm's length commercial transaction created by the Agreement. (See Ex. 1). Courts have generally held that no fiduciary relationship arises between parties that are dealing at arm's length in ordinary commercial relationships. See, e.g., *In re Mid–Island Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir. 2002); *In re Groover*, No. 03-51013, 2004 WL 212948, at *6 (Bankr. M.D.N.C. Jan. 16, 2004) (citing *S. Atlantic Ltd. P'ship of Tenn., L.P. v. Riese*, 284 F.3d 518, 533 (4th Cir. 2002)).

Instead, Plaintiff argues that there was a technical trust by virtue of the "trust fund doctrine" under New York State law.[7] (Doc. 33 at 9-10). Under this doctrine, directors of an insolvent

---

[7] The Agreement designates the application of Delaware law. (Ex 1. Section (15)(a) at 10-11). Both Debtor and Itria cite exclusively to New York law and have not argued Delaware law nor that its application would produce a different outcome. Accordingly, this court shall apply New York Law. See *Call Center Technologies, Inc. v. Grand Adventures Tour & Travel Publishing Corp.*, 2 F. Supp. 3d 192, 197 (D. Conn. 2014), *aff'd by Call Center Technologies, Inc. v.*

corporation hold the remaining corporate assets "in trust" for the benefit of general creditors. See,

e.g., *Credit Agricole Indosuez v. Rossiyskiy Kredit Bank*, 94 N.Y.2d 541, 549 (N.Y. 2000) (citing

*N.Y. Credit Men's Adjustment Bureau v. Weiss*, 278 A.D. 501, 503, (App. Div. 1951)). The trust

fund doctrine, if applicable to this case, would satisfy the "fiduciary" requirement under Section

523(a)(4). *See In re Gucciardo*, 577 B.R. 23, 34 (Bankr. E.D.N.Y. 2017) ("Because this duty

arises at the time of insolvency and prior to wrongdoing, it meets the requirements of fiduciary

capacity under § 523(a)(4).").

Itria fails to present adequate evidence that the Company was insolvent under New York

law. Itria must show that the Company was unable, not simply unwilling, to pay its liabilities as

they became due. See N.Y. Bus. Corp. Law § 102(8) (McKinney). The record is devoid of

evidence as to the Company's outstanding liabilities, when payments were due and whether the

Company had sufficient funds to pay its debts as they became due. Itria primarily relies on

Debtor's testimony that "I wasn't making any money" and that the Company had laid off

employees. (Tr. 26, 77). At best, this evidence reflects the Debtor's subjective opinion that the

Company was not profitable enough to keep the business going. Lack of profitability, however,

does not establish insolvency under the state law definition. Nor does the testimony that the

Company was being evicted by its landlord (Tr. 42) establish insolvency to trigger application of

the trust fund doctrine. The eviction could have been based upon the breach of a nonpayment

covenant. Without more, the court can only speculate as to its cause. However, even if the eviction

were based on the nonpayment of rent, that alone would be insufficient to establish that the

---

*Grand Adventures Tour & Travel Publishing Corp.*, 622 Fed. Appx. 73 (2d. Cir. 2015) (holding that a party may relinquish its right to have the laws of a particular state applied if it fails to raise the issue in a timely manner); *Tehran-Berkeley Civil and Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989) (holding that the parties' briefs discussing only New York law gave implied consent to use New York law).

Company was unable to pay its rent. There is no evidence as to the amount of rent then due and whether the Company could have afforded to pay it. Instead, it would simply have demonstrated that the Company was not paying rent.

The only other regular Company payment addressed by the evidence was the $505.16 debited by Itria each business day from the Company's operating account. On the day prior to Debtor filing bankruptcy, the Company had $7,790.63 in its operating account which shows that the Company had funds to pay this debt as it became due, but simply did not do so.

It is within the purview of this court to determine whether the evidence presented is sufficient to support a finding of insolvency. *Lawson v. Ford Motor Co. (In re Roblin Industries, Inc.)*, 78 F.3d 30, 35 (2d Cir. 1996). Based upon the record, the court finds that Plaintiff has failed to carry its burden of proof to establish the threshold issue of insolvency of the Company and thereby trigger the trust fund doctrine and the imposition of a technical trust under New York law.[8] Accordingly, the requisite fiduciary relationship is lacking for Itria to prevail on its section 523(a)(4) claim. Debtor's motion to dismiss this claim shall be separately granted.

*Itria's Cause of Action Under 11 U.S.C. § 523(a)(6)*

Section 523(a)(6) excepts from discharge any debt, "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). Itria must establish that Debtor's conduct was both "willful" and "malicious." *In re Guthier*, No. 08-33020, 2010 WL 1443989, at *4 (Bankr. N.D.N.Y. Apr. 9, 2010) (citing *In re Krautheimer*, 241 B.R. 330, 340 (Bankr.S.D.N.Y.1999)); *see also In re McDermott*, 434 B.R. 271, 282 (Bankr. N.D.N.Y. 2010)

---

[8] Though the state definition of insolvency controls for the purpose of Section 523(a)(4), there is similarly insufficient evidence to establish insolvency under the federal definition, which requires that an entity's liabilities exceed its assets. See 11 U.S.C. § 101(32)(A). The Company's tax returns are not in evidence nor is there any valuation evidence of the Company. The Company is not a debtor before this court and there are no sworn schedules listing all the Company's assets and liabilities upon which to base any such determination.

("The terms "willful" and "malicious" are considered two distinct elements and the creditor has the burden of establishing both.").

"Willful" denotes, "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Id.* (citing *Kawaauhau v. Geiger,* 523 U.S. 57, 61–2 (1998)). Willfulness must be demonstrated by showing that a debtor acted with the subjective intent to cause the injury *or* objective knowledge that his acts were substantially certain to cause injury. *In re Shelmidine,* 519 B.R. 385, 391-92 (Bankr. N.D.N.Y. 2014) (*citing Miller v. J.D. Abrams, Inc. (In re Miller),* 156 F.3d 598 603 (5ᵗʰ Cir. 1998); *Conte v. Gautum (In re Conte),* 33 F.3d 303, 307 (3d Cir. 1994).

"Malice" is defined as "wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will." *Navistar Fin. Corp. Stelluti (In re Stelluti),* 94 F.3d 84, 87 (2d Cir. 1996). Malice may be implied "by the acts and conduct of the debtor in the context of the surrounding circumstances." *In re Hanes,* 214 B.R. 785, 822 (Bankr. E.D. Va. 1997) (citing *St. Paul Fire & Marine Ins. Co. v. Vaughn,* 779 F.2d 1003, 1009-10 *Stanley,* 66 F.3d 664, 668 (4th Cir. 1985)). Implied malice can be demonstrated by showing that a debtor "deliberately and intentionally committed an act which he knew would necessarily injure a cognizable right of the creditor." *In re Hunter,* 229 B.R. 851, 860 (Bankr. M.D. Fla. 1999) (quoting *Cladakis v. Triggiano (In re Triggiano),* 132 B.R. 486, 490 (Bankr. M.D. Fla 1991)).

Under the requisite circumstances, a debtor's conversion of a secured creditor's collateral can rise to the level of a willful and malicious injury. *In re Shelmidine,* 519 B.R. 385, 391-92 (Bankr. N.D.N.Y. 2014) (*citing In re Foust,* 52 F.3d 766 (8ᵗʰ Cir. 1995); *Martin v. Key Bank N.A. (In re Martin),* 208 B.R. 799, 083 (N.D.N.Y. 1997); *United Orient Bank v. Green,* 215 B.R. 916, 928 (S.D.N.Y. 1997); *Moog Emps. Fed. Credit Union v. Kibler (In re Kibler),* 172 B.R. 740, 743 (Bankr. W.D.N.Y. 1994)). Courts have also found willful and malicious injury in cases where a

14

debtor "intended to improperly dispose of a secured creditor's collateral and used the proceeds for purposes other than payment of the secured debt." *Id.* (quoting *Farmers State Bank of W. Illinois v. Simpson (In re Simpson)* 2010 WL 1521309, at *2 (Bankr. W.D. Ill. Apr. 14, 2010) (citing *In re Russell*, 262 B.R. 449, 455 (Bankr. N.D. Ind. 2001)).

Itria alleges that Debtor willfully and maliciously converted to his own use Company property that comprised its secured collateral. This includes: (i) $7,336.15 that Debtor withdrew from the Company's operating account just prior to filing bankruptcy (ii) $12,086.00 in accounts receivable which Debtor collected on Company contracts and retained (iii) $9,589.44 in proceeds of inventory sold to Tarson Pools and paid to an affiliate (iv) $5,000 worth of solar covers which Debtor gave away (v) $1,200 rental value of a dump truck belonging to the Company which Debtor personally retained and used and (vi) "remaining collateral...delivered to his new d/b/a/ Syracuse Pool Pros..." (Doc. 33 p. 17-18).

Debtor withdrew almost the entire balance from the Company's operating account which he deposited into his personal account. Debtor testified that he was aware that doing so would prevent Itria from debiting further payments that were owed under the Agreement. (Tr. 39). From Debtor's admitted knowledge and deliberate act of taking the funds for himself, the court infers his willful intent to injure Itria. The court further finds Debtor's conduct to be malicious without just cause or excuse. Itria was contractually entitled to those funds and Debtor fails to offer a reasonable justification for his actions. Debtor stated that he withdrew the funds as wages, but the record does not support this argument. The Company operated seasonally and Debtor testified that at the time no work was being done and the Company had no employees. Debtor testified that standard payroll deductions were regularly taken every time the Company paid wages and wages were recorded in the Company's accounts. (Tr. 41, 75-76). This corporate practice was not

followed in this instance and instead an off-the-books lump sum withdrawal was made without

any indicia of reliability that they were wages. (See Ex. 20; Tr. 39-40). The court rejects the

Debtor's position and finds the $7,336.15 withdrawn by Debtor from the Company's operating

account nondischargeable under 11 U.S.C. § 523(a)(6).

Debtor, as a volunteer, picked up contracts which belonged to the Company, performed

work for customers that were under contract with the Company, and collected the payments for

himself. Debtor identifies these in his sworn schedules as accounts receivable of the Company.

Itria was secured in the Company's accounts receivable. (Ex. 1, Section (9)(a) at 8). The proceeds

of those contracts were "Future Receivables" under the Agreement. (Ex. 1, Section (2)(d) at 3).

Itria was secured in the contracts themselves as well as in the accounts generated by those contracts

under the Agreement.

Debtor makes the point that he performed work on the contracts at a loss as an apparent

justification for retaining the funds generated on the accounts receivable and that he felt a moral

obligation to undertake the work even though he was not under a legal obligation to do so. (Tr. at

58).[9] That Debtor volunteered to complete the Company's contracts or the fact that he did so at a

financial loss to himself do not serve as legal bases to keep the proceeds of the Company's

contracts for himself. The court finds the Debtor's testimony in this regard disingenuous. Debtor

is a savvy businessman who knows the importance of good public relations and customer

satisfaction in operating a personal services business in a mid-sized community such as the greater

Syracuse area. The court deduces that Debtor viewed the open contracts as an investment in his

future services business, with the thought that satisfied customers would return to him for future

---

[9] Debtor declined to file a post-trial submission, even after having been given an extension of time to do so. (See Doc. 34). Debtor fails to cite any law to support his position that he gets to keep the accounts receivable because of work that he voluntarily completed on behalf of the Company.

annual pool servicing. Performing the balance of the contracts was a cost of doing business that could yield future benefits. It is undisputed that the contracts belonged to the Company. The court finds that the proceeds of the contracts were accounts receivable on the Company's contracts and, therefore, assets of the Company and not of Debtor. See, e.g. *In re Wong*, 291 B.R. 266, 282 (Bankr. S.D.N.Y. 2003) ("Accounts receivable are corporate assets: not assets of the Debtor.").

Courts have held that such conduct satisfies the elements of Section 523(a)(6). In *In re Groover*, 2004 WL 212948 (Bankr. M.D.N.C. Jan. 16, 2004), debtors who co-owned a drywall company diverted funds from the company to their own accounts, including payments from general contractors who contracted with and rightfully owed money to their company. *Id.* at *1. The plaintiff-creditor had purchased the company's accounts receivable through a factoring agreement. *Id.* at *8. The court held that such conduct was sufficient to satisfy the requirements under Section 523(a)(6), and that, by diverting funds on existing contracts away from the company, debtors had willfully and maliciously injured the creditor by denying the creditor funds to which it was entitled. *In re Groover*, 2004 WL at *7-8 (citing *In re Wong*, 291 266 B.R. at 280)).

Here, Debtor admitted in his schedules that this unfinished work constituted accounts receivable belonging to the Company. (Schedule A/B, Part 5, Line 38 Ex. 22 at 17). Debtor admitted that he performed the contracts and pocketed the funds for himself rather than depositing them with the Company. Debtor's schedules valued the Company's accounts receivable at $6,756.00. The court recognizes Debtor's subsequent testimony at trial that he actually collected $12,086.00 on these accounts. Debtor diverted the funds with the intention of pocketing them for himself, and additionally intended to keep them away from Itria. Debtor's conduct was malicious because the funds rightfully belonged to the Company and to Itria as a secured creditor.

Accordingly, the court finds an additional $12,086.00 nondischargeable pursuant to 11 U.S.C. §523(a)(6).

Itria has a security interest in all of the Company's inventory, including the inventory which Debtor sold to Tarson Pools for $9,589.44. (Ex. 1 § (9) at 8). The court rejects Debtor's disclaimer that he was unaware of Itria's security interest in other than future receivables. In signing the Agreement, Debtor acknowledged Itria's security interest in all of the Company's property. Debtor had entered into many prior financing arrangements and his business experience would inform his understanding that Plaintiff looked to secure its financing and limit its exposure by obtaining the broadest security interest possible. Debtor knew that Itria would be injured if the inventory securing Itria's interest was sold and the proceeds were not made available to Itria. Debtor failed to provide a valid excuse for his disposal of the Company's inventory in this manner. Debtor liquidated Itria's secured collateral and diverted the proceeds to a company jointly owned with his brother. The court finds that Debtor acted willfully and maliciously in this transaction and finds an additional $9,589.44 to be non-dischargeable pursuant to 11 U.S.C § (523)(a)(6).

Similarly, Debtor willfully and maliciously injured Itria by giving away and thereby converting solar covers owned by the Company in which Itria was secured. Debtor was aware that Itria's security interest in the Company's inventory included the solar covers. Despite this, Debtor allowed the solar covers to be given away free of charge, with full knowledge that Itria would be injured by their disposal. The parties stipulated that each solar cover had a fair market value of $100.00 and that a total of 50 solar covers were disposed of in this fashion. The court finds an additional $5,000.00 non-dischargeable pursuant to 11 U.S.C. § (523)(a)(6).

18

Itria argues that it is entitled to the rental value of Debtor's use of equipment belonging to the Company for jobs completed by Debtor doing business as Syracuse Pool Pros. (Doc. 33 at 5-6). Debtor admitted that he used this equipment to complete jobs through Syracuse Pool Pros. (Tr. 61-63, 84). Itria's security interest extended to the Company's equipment. Debtor estimated that he used the equipment for approximately 16 hours. (Tr. 60). Debtor also testified that he would have paid approximately $75.00 an hour if he had to rent the dump truck for the pool-related jobs. (Tr. 34).

Itria provides no other evidence regarding this claim. Based on Debtor's testimony, the court finds that Debtor owes the Company rent equal to $1,200.00 for his personal use of the Company's equipment. Itria's secured claim extends to that rental income. Debtor's conduct was willful because he intended to use the equipment for his own benefit, and he intended to do so for free, thereby denying the Company and, by extension, the Company's creditor, the benefit of the rental income. Debtor's conduct was malicious because he had no legal justification for using the Company's equipment without paying due consideration. The court, therefore, holds an additional $1,200.00 nondischargeable.

*Damages*

Based on the forgoing, the court holds the amount of $35,011.59 nondischargeable under 11 U.S.C. § 523(a)(6). The total damages consist of: (i) $7,336.15 in funds withdrawn from the Company's operating account (ii) $12,086.00 in Company accounts receivable collected by Debtor (iii) $9,389.44 proceeds from inventory collateral sold to Tarson Pools (iv) $5,000.00 in inventory collateral given away and (v) $1,200.00 for rental value of Company dump truck.

The court declines to hold Itria's entire claim of $178,720.68 nondischargeable. Notwithstanding the nondischargeable amount of $35,011.59, Itria has failed to show how its

19

entire claim derived from a willful and malicious injury. To be held nondischargeable under Section 523(a)(6), the nondischargeable debt itself must arise from the willful and malicious injury. See, e.g., *In re Heilbron*, Case No. 18-01055, 2020 WL 259563, at *23 (Bankr. E.D.N.Y. Jan. 15, 2020) ("Section 523(a)(6) requires a plaintiff to establish that the debt at issue arises from an injury to the plaintiff or the plaintiff's property"); *In re Alexander*, 503 B.R. 19, 22 (Bankr. W.D.N.Y. 2013) ("Therefore, to be non-dischargeable within the context of section 523(a)(6), a debt must arise from an injury that is both willful and malicious."); *In re Lampe*, Case No. 16-09034, 2017 WL 6568050, at *5 (Bankr. N.D. Iowa Dec. 22, 2017) (citing *In re Jeffries*, 378 B.R. 248, 256 (Bankr. W.D. Mo. 2007) ("While Plaintiff has asked that this Court find the entire debt nondischargeable, the debt may be declared nondischargeable *only to the extent of the damage caused by Debtor's willful and malicious conduct*.") (emphasis added).

The court rejects Itria's attempt to extend its reach as a secured creditor of the Company to Debtor and the fruits of his personal service. Itria's argument suggests successor liability but it is a misplaced attempt to bind an individual as a successor in interest to a corporation, which is not recognized under New York law. Successor liability may be found under certain circumstances where a purchasing corporation acquires another corporate entity. See *N.Y. v. Nat'l Serv. Indus., Inc.* 460 F.3d 201, 209 (2d Cir. 2006) (citing *Schumacher v. Richards Shear Co.*, 59 N.Y.2d 239, 245 (N.Y. 1983)). Courts in New York apply the doctrine where the successor in interest is a corporation, not an individual. The term "business entity" in New York does not include "natural persons". See *Hamilton Equity Group, LLC v Juan E. Irene, PLLC*, 957 N.Y.S.2d 527, 530 (N.Y.A.D. 4 Dept., Dec. 28, 2012) (citing § NY. Bus. Corp. 901[b][7]). ("The term '[o]ther business entity,' as defined under the Business Corporation Law, excludes 'a natural person'."). This court is unaware of any case where, under New York law, an individual, even one acting as

20

a sole proprietor doing business under another name, has been held to be a successor in interest to a corporate entity.

Itria relies on *In re Frankel*, 77 B.R. 401 (Bankr. W.D.N.Y. 1987) for the proposition that an individual may be held liable for corporate debts. (See Doc. 33 at 7-8). Itria's reliance is misplaced. The court in *In re Frankel* held that the debtor, acting as a fiduciary, sold corporate assets which secured a creditor's claim. In so doing, he committed defalcation, and was therefore held personally liable for the injury caused by his personal conduct. *In re Frankel*, 77 B.R. at 404. The case does not stand for the proposition that a natural person can be held as a successor in interest to a corporate entity under the theory of successor liability.

In essence, Itria seeks to bind Debtor's future earnings from his own personal services as he continues to work in the pool service industry. These services are separate from those of the Company. This extreme remedy would run afoul of the Thirteenth Amendment of the Constitution. See U.S. Const. amend. XIII § 1. Courts have acknowledged Congress' clear intent to adhere to the Thirteenth Amendment and protect an individual's future income, as reflected in numerous provisions of the Bankruptcy Code. Section 541(a)(6), for example, expressly excludes certain property from the estate, including, "earnings from services performed by an individual debtor after the commencement of the case." See 11 U.S.C. § 541(a)(6); see also *In re Molina Y Vedia*, 150 B.R. 393, 398-99 (Bankr. S.D.Tx. 1992) ("Section 541 must be read to balance appropriate legislative concerns...namely, the Thirteenth Amendment's prohibition against involuntary servitude."); *In re Powell*, 187 B.R. 642, 646 (Bankr. D.Minn. 1995) ("the earnings exception contained in § 541(a)(6) is the manifested expression of the desire by Congress to avoid any potential conflict with the Thirteenth Amendment's prohibition against involuntary servitude.").

In *In re Molina Y Vedia*, the court determined that the debtor, who was a sole proprietor and physician who filed for bankruptcy under chapter 11, was entitled to his post-petition income as a physician, and that a finding to the contrary would violate the Thirteenth Amendment's protection against involuntary servitude and Section 541(a)(6). *In re Molina Y Vedia*, 150 B.R. at 398-99. This court acknowledges that Debtor has practiced in the pool service trade for over three decades and has the right to continue practicing in this field of work. Neither any employment agreement with the Company nor the Agreement itself contained a covenant not to compete. Debtor is free to provide pool-related services as a sole proprietor in his own capacity.

Though Itria is an unsecured creditor as to Debtor, this court acknowledges Itria's position as a secured creditor of the Company. The Company is not a debtor before this court nor a party to this action. Itria is free to pursue its rights as a secured creditor of the Company, including foreclosure of its interest in all of the Company's secured collateral that may be in the possession of the Company, Debtor, or any other entity. The nondischargeability of a portion of Itria's unsecured claim against the Debtor does not limit Itria's remedies as a secured creditor of the Company.

## Conclusion

Based on the foregoing, Itria's claim under 11 U.S.C. § 523(a)(4) shall be dismissed and $35,011.59 of Itria's claim is found to be nondischargeable under 11 U.S.C. § (523)(a)(6).

So Ordered.

Dated:  September 11, 2020        Margaret Cangilos-Ruiz
Syracuse, New York              United States Bankruptcy Judge

22